Filed 3/1/16  In re N.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.D. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SANDY D., <br><br> Defendant and Appellant. | F071766 <br><br> (Super. Ct. Nos. JD130534, JD130364 and JD130365) <br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Louie L. Vega, Judge.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Sandy D. (mother) appeals from the June 4, 2015, order of the juvenile court denying her petition pursuant to Welfare and Institutions Code section 388,[1] regarding her son, N.D. We affirm.

### FACTUAL AND PROCEDURAL HISTORY

*B.D. and C.D.'s Section 300 Petition[2]*

Mother came to attention of the Kern County Department of Health and Human Services (Department) in March of 2013 when she became homeless and left her two younger children, one-and-a-half-year-old B.D. and six-month-old C.D., in the care of their maternal grandmother, whose home was filthy and unsafe and lacked adequate food. Maternal grandmother reported mother was constantly "bouncing" from home to home with the children and there was likely drug use in these homes. A social worker described mother's appearance as consistent with "chronic methamphetamine use." Mother, who became very belligerent with the social worker, admitted sometimes daily methamphetamine use.

A section 300 petition was filed alleging mother was unable to care for B.D. and C.D. due to her substance abuse and that the children were at substantial risk of harm if left in maternal grandmother's care. The two children were detained on March 12, 2013, and placed together in a foster home.

During an interview prior to B.D. and C.D.'s detention hearing, mother revealed that her older son, N.D.[3], then age nine and a half, had been residing with his father,

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     B.D. and C.D. are not subjects of this appeal.

[3]     N.D.'s full first name was misspelled throughout most of the case. It was corrected in April of 2015 when a copy of his birth certificate was submitted to the juvenile court.

Joshua D. (father), since January of 2013, when mother admitted herself into a drug program, Teen Challenge. Mother left the drug program after one month, but admitted she needed inpatient treatment in order to address her long-standing substance abuse problem.

The social worker discovered several prior child welfare referrals between 2007 and 2012 alleging physical abuse and general neglect of the children and mother's drug use. At one point, N.D. was taken from mother for abandonment. Mother reported that she had been the victim of domestic violence by father and by B.D. and C.D.'s father, Frank D. Two of the prior child welfare referrals involved domestic violence incidents where mother was beaten by either father or Frank D. in N.D.'s presence.

On March 28, 2013, mother was arrested for possession of controlled substance paraphernalia.

On April 8, 2013, the Department received a new referral of general neglect concerning N.D. According to the reporting party, father was incarcerated and N.D. was left in the care of father's girlfriend, who had previously lost custody of her own children in dependency proceedings due to her own substance abuse issues. Mother had subsequently picked up N.D. from school and their whereabouts were unknown to the reporting party.

The next day, when the social worker was able to meet with mother, mother reported she and N.D. were residing in a homeless shelter. Mother was advised a child welfare investigation would be conducted for N.D.

On April 17, 2013, the juvenile court conducted a jurisdiction hearing for B.D. and C.D. and mother submitted on the substance abuse allegation.

Mother attended the hearing, but at first refused to disclose N.D.'s whereabouts. She eventually disclosed he was with maternal grandmother. That same day, the social worker was unable to locate N.D. at either his maternal grandmother's or his father's house. A protective custody warrant was executed and N.D. was ultimately found to be

3.

with mother at maternal grandmother's home.  Disposition on B.D. and C.D. was continued.

*N.D.'s Section 300 Petition*

On April 18, 2013, the Department filed a section 300 petition alleging N.D. was at risk of harm due to mother's substance abuse and was at similar risk of abuse and neglect as B.D. and C.D.  On April 22, 2013, a first amended petition was filed, adding allegations against father, based on his substance abuse, criminal history, and failure to protect N.D. from mother and from his girlfriend.

*N.D.'s Detention Hearing*

According to the Department's detention report, N.D. revealed to a social worker that he knew about illegal controlled substances.  He reported mother used to use "weed," but had not done so for a month.  An "uncle" used to "shoot up with needles in front of us" at maternal grandmother's before she kicked him out of the house.  According to N.D., his father smoked marijuana about once a week, but did not do so in N.D.'s presence.

The detention hearing was held April 23 and 25, 2013.  N.D. was detained from both mother and father and family reunification services ordered.  Mother was given one hour supervised visits per week; siblings visits were to occur one hour every other week. Jurisdiction and disposition hearings were scheduled.

*N.D.'s Jurisdiction Hearing*

The May 30, 2013, report prepared in anticipation of jurisdiction, stated N.D. had previously been declared a dependent of the juvenile court in Nebraska in 2005 based on allegations of neglect.  Mother had received the equivalent of family reunification services at that time.  As of April 29, 2013, mother was enrolled in an inpatient substance abuse program, Casa Serena.  When mother met with the social worker on May 10, 2013, she reported she had been "clean" for 17 days, which she claimed was the was longest

4.

period of sobriety she had maintained since C.D. was born. According to mother, she had been using methamphetamine in order to get off of "hard core" drugs.

At the jurisdiction hearing May 30, 2013, the juvenile court sustained N.D.'s petition. The juvenile court ordered a psychological evaluation for mother in order to determine whether mother was able to utilize reunification services. The disposition for all three children was continued until July 10, 2013.

*N.D., B.D. and C.D.'s Disposition Hearing*

Disposition was continued several times in order to allow mother to complete her psychological evaluation.

Reports prepared in anticipation of disposition recommended out-of-home care for N.D. and family reunification services for mother. Mother was diagnosed with polysubstance dependence; mood disorder, not otherwise specified; and child neglect. The psychologist who evaluated mother on July 24, 2013, recommended that, in order for mother to successfully complete family reunification, she engage in substance abuse counseling, participate in random drug testing, undergo a psychological and psychiatric evaluation to determine her counseling and medication needs, continue parenting and anger management classes, obtain appropriate housing, and consider additional education to secure employment.

On September 25, 2013, mother was referred to "guided visitation" after displaying frustration with her children and interacting inappropriately with N.D. during visits. Mother completed a parenting course on September 25, 2013; was showing good progress in her substance abuse program, which included group and individual counseling; and drug tested negative since May of 2013.

Mother was present when disposition was held for all three children on October 8, 2013. The juvenile court found mother made minimal progress towards alleviating or mitigating the causes for the children's placement in out-of-home care. All three children were removed from mother's custody and reunification services ordered for mother,

including mental health and anger management counseling, substance abuse treatment, and random drug testing. Mother was also ordered to attend a psychotropic medication evaluation and comply with physician's directives, if any. The juvenile court ordered mother have weekly supervised visits with N.D. and every other week visits with N.D.'s siblings. A six-month review hearing was scheduled for April 8, 2014.

*Family Reunification Period*

    *A. Six-Month Review*

The report prepared in anticipation of the six-month review stated mother completed a substance abuse class in February of 2014; completed anger management counseling in March of 2014; received a mental health evaluation and was currently prescribed medication; and drug tested negative from October 11, 2013, to March 17, 2014. A second psychiatrist diagnosed mother with generalized anxiety disorder; major depressive disorder, recurrent episode, mode; amphetamine-induced mood disorder; and bipolar affective disorder, mixed, moderate. Various psychotropic medications were prescribed. During visits, mother was said to have limited interaction with N.D. and, when she did, she responded negatively to him, was short-tempered and impatient.

In summary, the report stated mother successfully completed all components of her case plan, but the Department was concerned with the relationship between mother and N.D., as she had been observed to be negative, angry and easily frustrated with him during visits. The Department recommended continued guided visitation and transitioning to unsupervised visits before considering returning N.D. to mother.

At the six-month review April 8, 2014, the juvenile court found mother made moderate progress toward alleviating or mitigating the causes for out-of-home placement and adopted the recommendations of the Department. Mother was ordered to participate in counseling for guided visitation. A 12-month review hearing was scheduled for May 7, 2014.

*B. 12-Month Review*

The report prepared for the 12-month review hearing stated mother completed all components of the case plan, but although guided visitation had been incorporated, she had only received one such visit. Mother continued to use foul language around the children and to reside in a homeless transitional housing program that did not allow children. The Department recommended continued guided visitation while mother secured housing and to then transition to unsupervised visits before placing the children back with mother.

At the 12-month review hearing May 7, 2014, the juvenile court adopted the findings of the Department and an 18-month review hearing set for September 8, 2014.

*C. 18-Month Review*

The report prepared for the 18-month review hearing stated mother had not been in compliance with her psychotropic medication during this period of review, as she had not refilled her prescription since February of 2014. Mother attended seven of 12 guided visitation sessions. Mother had been making progress until she failed to show for her last three visits and failed to contact the coordinator to cancel the visits. Mother had a "suspicious" drug test in May of 2014 and missed a drug test in June of 2014. During June and July of 2014, mother missed five consecutive weeks of visits. Mother explained her missed visits occurred because she was "in a rut." At the visits she attended, mother continued to have limited interaction with N.D., she responded negatively to him, was short-tempered, impatient, and continued to curse during visits. The Department recommended family reunification services be terminated as she failed to make progress during the review period and she had had 18 months to comply.

The September 8, 2014, review hearing was continued until October 7, 2014, at mother's request. The October 7, 2014, hearing was continued by stipulation of counsel in order to get further information on mother's medications and to allow mother to finish some guided visitation hours. The new hearing was set for December 2, 2014.

The supplemental report prepared in anticipation of the December 2, 2014, 18-month review hearing added that mother began a second series of guided visits in August of 2014. On October 2, 2014, the visitation coach reported mother made "tremendous improvements," but recommended two additional sessions to help mother and N.D. work on communication skills and to help mother effectively divide her time between N.D. and the two younger children. As of October 2014, mother attended all visits in a timely fashion. She drug tested twice, both negative, in October and November 2014.

Apart from the "guided" visits, mother also had regularly scheduled visits at the Department. At those visits, mother had trouble managing all three children together and during one visit in early November 2014 got fed up and walked out. N.D. reported that he felt responsible for how the visit went. On November 18, 2014, mother requested that the visits be split up so she could visit with N.D. by himself, but her request was declined. N.D. heard mother's request and asked her if she thought the difficulty at the visits was his "fault." The social worker offered mother a referral for conjoint therapy with N.D.

Mother secured housing in September of 2014, but at the end of the month was still in need of furniture for the children. Prior to that, she had been in a homeless transitional housing program that did not allow children.

Adoption assessments were completed for the children. Long-term foster care was recommended for N.D. The younger children, B.D. and C.D. were considered adoptable, but their foster caretaker was not willing to adopt. B.D. and C.D. were placed in the prospective adoptive home of Mr. and Mrs. S. in November of 2014, and N.D. was moved back to his former foster home.

At the 18-month review hearing December 2, 2014, the juvenile court found mother made moderate progress towards alleviating the issues which led to detention, and she had made acceptable efforts to avail herself of reunification services. The juvenile court found it could not return the children to mother because of continuing "significant"

problems during her visits with the children. Reunification services were terminated and a section 366.26 selection and implementation hearing was set for all three children April 1, 2015. Mother's visits were continued and she was authorized to participate in conjoint counseling with N.D., if that was in his best interests.

*Extraordinary Writ Petition*

Mother filed a petition for extraordinary writ challenging the juvenile court's findings that it was detrimental to return the children to her and terminating family reunification services. We denied her writ on the merits on March 2, 2015, in case No. F070541.

*Section 388 Petitions*

On March 24, 2015, mother filed a section 388 petition for each child. The petition for N.D. alleged mother had complied with all court orders, she continued to test clean, and she was currently participating in conjoint counseling with N.D. Mother continued to visit all three children and alleged the quality of the visits was good and continued to improve. Mother asserted it would be in N.D.'s best interest to return him to her care with family maintenance services or, in the alternative, that she receive additional reunification services. The hearing on the petitions were scheduled for May 11, 2015, to coincide with the continued selection and implementation hearing.

*De Facto Parent Request and Section 388 Petition*

On April 21, 2015, Mr. and Mrs. S. filed a request to be declared de facto parents of B.D. and C.D. They also filed a section 388 petition requesting N.D. be placed in their home for adoption as well. According to Mr. and Mrs. S, N.D. had been having weekend visits in their home and they would "love placement" of N.D. for adoption with his younger siblings as a sibling group. While Mr. and Mrs. S. realized N.D. was attached to his mother, they were giving him "space to think about … this decision," but they were willing to provide him with permanency and to continue contact with mother, if

appropriate. The hearing on the request and petition were set for the May 11, 2015, joint hearing.

*Joint Section 388 Petitions and Section 366.26 Hearing*

Mother was present at the combined sections 388 and 366.26 and status review hearing held June 4, 2015.

The Department submitted a social study for the section 366.26 hearing, dated March 19, 2015, recommending long-term foster care for N.D. and termination of mother's parental rights for B.D. and C.D. N.D. was now 11 ½ years old, had been in several foster care placements during the case, was in counseling, and was an "outstanding" student.

During the course of dependency, mother attended 60 out of a possible 171 visits with N.D. During visits following the termination of reunification services, mother was still very negative and argumentative toward N.D. Long-term foster care was recommended for N.D. as he and mother had a "more substantial relationship" and the relationship "should continue." N.D. expressed to the social worker that he wished to live with mother, but if that was not possible, to remain in his current placement.

A supplemental section 366.26 report dated March 30, 2015, reflected that N.D. was generally not adoptable due to his age and lack of available adoptive homes. N.D. wished to continue his relationship with mother and, in view of his age, he would have to agree to adoption.

The May 11, 2015, hearing was continued, in part because N.D. was not present. A new hearing was set for June 2, 2015.

The Department's status review report dated May 26, 2015, stated that, when the social worker spoke to N.D. about his placement option in April of 2015, he was torn between remaining in his current foster home or living in the same home as B.D. and C.D. N.D. was concerned that he would be "bored" living with Mr. and Mrs. S., because they lived in the mountains.

10.

Another supplemental report dated May 29, 2015, concerned the section 388 petition filed by Mr. and Mrs. S. During a supervised visit, N.D. disclosed to the social worker that his foster parents drank heavily, cursed at him and told him he would not be returning home. If he was not able to return to mother, he now wished to live with his siblings at Mr. and Mrs. S.'s. The Department recommended the section 388 petition filed by Mr. and Mrs. S. be granted.

The Department filed a report dated May 29, 2015, in response to mother's section 388 petition stating mother was compliant with her medication management for her mental health issues since the end of April 2015, but "one month compared to 18+ months is not sufficient." Mother consistently drug tested negative between February 9 and May 19, 2015, and had valid excuses for the two tests she missed.

Incidents, both positive and negative, between mother and N.D. at various visits were described in the report. The social worker opined that, despite mother's progress with the case plan, she remained "short tempered, negative, and angry" towards N.D. Mother continued to have verbal altercations with him at visits, and she was not utilizing the tools she had been provided from her parenting and guided visit coaching. According to the social worker, "There are ongoing concerns for the children's physical safety if the mother becomes upset or frustrated," and "there are questions regarding the mother's ability to protect the children if the children were returned to the mother's care." N.D. reportedly took on the "parenting role" with B.D. and C.D. and took the blame when something went wrong. The social worker recommended mother's section 388 petition be denied, as there was a substantial risk of detriment to the children if they were returned.

At the June 4, 2015, hearing, mother testified that she completed her case plan requirements and took some extra counseling on budgeting, recovery and Bible study through a local ministry, "until it started conflicting with other things." Mother was

currently in a three-bedroom, two-bath home and she had a bed for N.D. The local ministry was willing to provide her with other necessities, as was the social worker.

When asked about visits, mother testified that she and N.D. were "communicating better." She acknowledged acting inappropriately during a visit in November of 2014 when she left early. Mother requested and received joint counseling with N.D., but although she showed up for all five or six scheduled sessions, N.D. was only brought to two of the sessions due to school conflicts.

Mother felt visits with N.D. had improved "dramatically" as she was able to effectively direct him. Mother had resumed taking her anxiety medication in October or November of 2014, making everything "a lot easier to deal with." Mother testified she had no intention of going off of her medications and she agreed they made a difference.

Mother wanted all three children returned to her care. Mother stated she had a support system in place, including her addiction sponsor, church meetings, several people who were sober who she could talk to, and "several relatives." According to mother, the guided visitation counselor was still available and willing to come out to assess them each week. Mother anticipated she could obtain additional referrals if family maintenance services were ordered. Mother was willing to continue counseling and do whatever she needed in order to care for her children.

N.D. testified he was in the 6th grade and wanted to return home to mother with his two siblings. N.D. thought his mother had "worked hard" to get them back, even though they had had some bad visits. Since November of 2014, N.D. had enjoyed "[m]ore very good visits" than hard ones. N.D. recognized his mother could be hard on him at times, but he did not doubt that she loved him and he loved her "[a] hundred percent." N.D. did not feel responsible for the dependency case, and he believed mother took full responsibility. N.D.'s first choice was to return home to mother with B.D. and C.D. If he could not, he wished to live with Mr. and Mrs. S. and his siblings.

On cross-examination, N.D. testified that he did not feel responsible if he had a bad visit with mother and he did not think it was his fault, even though mother blamed him at times. N.D. did not think he was unfairly put in a "grown-up" role. N.D. explained that, before the dependency case, after mother had C.D. and was on medication, he took care of his siblings and it was now "kind of hard" not to continue to do so.

The juvenile court, in its ruling, found N.D. to have a demeanor of "someone chronologically a lot older" and that he had assumed more responsibility than someone his age should have based on the circumstances. The juvenile court pointed to circumstances at the May 19, 2015, visit, in which B.D. fell out of a swing and mother told N.D. it happened because he distracted her. The juvenile court opined that incident occurred only "a couple of weeks ago" and was a good opportunity for mother to demonstrate good parenting, but she failed to do so. The juvenile court opined such incidents would recur if the children were returned to mother and illustrated "clearly what the problem continues to be." The juvenile court denied mother's section 388 petition, stating that it did not think services had "gelled to the point where the court could grant the 388 as requested."

The juvenile court then conducted the children's selection and implementation hearings and ordered N.D. into long-term foster care, after finding him not likely to be adopted. Supervised visits with N.D. were continued weekly for two hours. The juvenile court found B.D. and C.D. likely to be adopted and terminated mother's parental rights as to them.

The juvenile court granted Mr. and Mrs. S. de facto parent status as to B.D. and C.D. Mr. and Mrs. S. maintained their request to have N.D. placed with them, but withdrew their request to formally place him in adoptive planning since they were respectful of his wishes not to be adopted. Because N.D. was already at Mr. and Mrs.

S.'s for an extended visit, the juvenile court took no formal action on the section 388 petition filed by Mr. and Mrs. S.

The juvenile court then conducted a status review hearing for N.D. and found continued jurisdiction necessary and appropriate.

## DISCUSSION

Mother's only contention on appeal is that the juvenile court abused its discretion in denying her section 388 motion to either return N.D. to her custody with family maintenance services or, in the alternative, to reinstate reunification services. Mother contends the juvenile court denied her motion based not on evidence that N.D. would suffer physical or emotional abuse or neglect if reunification occurred, but rather on its own "'ideal'" parenting standard. We find no abuse of discretion.

Modification orders in juvenile dependency court are authorized by section 388. Essentially, the statute requires a showing of a change of circumstances and that modification based on that change would be in the "best interests" of the minor child. "A party may petition the court under section 388 to change, modify or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence, and (2) the proposed change is in the child's best interests." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 257.)

As explained in *In re Marilyn H.* (1993) 5 Cal.4th 295, section 388 is an "escape mechanism" when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights. (See *Marilyn, H., supra,* at p. 309.) As such, section 388 is vital to the constitutionality of our dependency scheme as a whole, and the termination statute, section 366.26, in particular. (*Marilyn H., supra,* at p. 309.) After reunification services are terminated, the child's needs for continuity and stability assumes an increasingly important role. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) However, "[e]ven after the focus has shifted

14.

from reunification, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*Marilyn H., supra,* at p. 309.) "[T]he Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*Ibid.*)

In re Kimberly F. (1997) 56 Cal.App.4th 519 (*Kimberly F.*), relied on by mother, does not support mother's position that the juvenile court required her to be a "perfect" rather than adequate parent. In *Kimberly F.*, the youngest two of mother's four children were removed from the home and placed with their relatives when the mother's home was determined to be in an unsanitary and unsafe condition. (*Id.* at pp. 522-523.) Although home conditions improved to some extent, the juvenile court at the 18-month review hearing set a section 366.26 hearing and terminated reunification services. (*Kimberly F., supra,* at p. 524.) Five months later, shortly before the section 366.26 hearing, the mother filed a section 388 petition, in which she demonstrated she had been keeping her home in a safe and sanitary condition. (*Kimberly F., supra,* at p. 525.) The juvenile court denied the mother's petition, finding there had been no change in circumstances and that the proposed modification would not be in the minors' best interests. (*Id.* at pp. 525-526.)

The appellate court in *Kimberly F.* reversed the order. It concluded, among other things, that (1) the juvenile court erred in finding no change of circumstances, since the facts indisputably showed that the home was no longer in an unsafe and unsanitary condition, i.e., the initial reason for the dependency (*Kimberly F., supra,* 56 Cal.App.4th at pp. 526-527); (2) the juvenile court improperly relied on a psychologist's descriptions of the mother's eccentricities that did not establish detriment (*id.* at p. 527); and (3) a determination of the best interest of the child could not be accomplished through a simple comparison between the parent's and the caretakers' respective households, but required

consideration of a number of factors, including the seriousness of the initial reason for the dependency and the strength of the parent-child bond (*id.* at pp. 529-531).

*Kimberly F.* is a factually different case than mother's. The appellate court in *Kimberly F.* assessed that the circumstances resulting in the dependency were not very serious, as compared with other cases. It stated that "even the most compulsive housekeeper would agree that a dirty house case generally lies at the other end of the continuum from sexual abuse and drug cases." (*Kimberly F., supra,* 56 Cal.App.4th at p. 531, fn. 9.) Here, the reasons for the dependency – chronic alcohol abuse and the absence of any provision for the adequate care of the children as a result of mother leaving the children with maternal grandmother and N.D.'s father's girlfriend – were much more serious and profound than "a dirty house case."

Yet mother seizes on a statement in *Kimberly F.* in which the court observed, "[t]he juvenile dependency system … exists to protect abused and neglected children, not serve as a kind of super-psychologist." (*Kimberly F., supra*, 56 Cal.App.4th at p. 530, fn. 8.) Mother contends that, in her case, the juvenile court held her to a "nebulous 'ideal' parenting standard, when the evidence showed it was not only safe, but in [N.D.]'s best interest" to be returned to her despite her "imperfections." We disagree.

The evidence before the juvenile court was that N.D. first came into protective custody in April of 2013 due to mother's substance abuse and general neglect of her children. Mother completed the basic components of her reunification plan, although she failed to become compliant with her mental health medication regimen until very late in the process. And she continued to struggle in her visitation with her children. During the entire 18 months of reunification, mother's attitude at visits with the children remained negative, angry, and short-tempered, especially towards N.D., who had through this process taken on a parenting role. Mother attended only 35% of possible visits with the children and, as late as May 2015, she was still not able to transition into unsupervised visits because of ongoing concern for the physical safety of the children when mother

16.

became upset or frustrated. The juvenile court did not abuse its discretion in finding that mother's circumstances had not changed.

Further, mother failed to meet her burden in demonstrating how removing N.D. from a safe and stable home and placing him with her served his best interest. There was no evidence presented on this issue.

The juvenile court did not abuse its discretion in denying mother's section 388 petition, and we reject her contention to the contrary.

**DISPOSITION**

The order is affirmed.


_____

         FRANSON, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

KANE, J.